UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SID IRONSON,<br>            *Plaintiff*,<br><br>       *v.*<br><br>AMERIPRISE FINANCIAL SERVICES, INC.,<br>            *Defendant.* | Civil No. 3:11cv899 (JBA)<br><br><br><br>September 10, 2012 |

RULING GRANTING DEFENDANT'S MOTION TO STAY AND TO COMPEL ARBITRATION

Plaintiff Sid Ironson filed suit against Defendant, Ameriprise Financial Services ("Ameriprise"), claiming that Defendant violated the Connecticut Franchise Act ("CFA") and the Connecticut Unfair Trade Practices Act ("CUTPA") in terminating his franchise agreement. Defendant moves to stay and to compel arbitration [Doc. # 19]. For the reasons that follow, Defendant's motion will be granted.

I.    BACKGROUND

Since 1991, Plaintiff has been the sole proprietor of a financial planning business. (Am. Compl. [Doc. # 18] ¶ 6.) When Plaintiff began his career, he worked as a financial advisor affiliated with IDS Financial Services, which eventually became Ameriprise. *(Id.* ¶¶ 6–8.) In 2000, Ameriprise instituted a policy requiring all of its affiliated financial advisors to choose whether to become Ameriprise employees or independent Ameriprise franchisees. (*Id.* ¶ 9.) Plaintiff elected to maintain his business as an independent Ameriprise franchisee, and signed an Independent Advisor Business Franchise Agreement ("Franchise Agreement") with Ameriprise. (*Id.* ¶ 9.) The Franchise Agreement contained the following arbitration clause:

A. Except as provided in Section 19, Independent Advisor and Ameriprise Financial agree to arbitrate any dispute, claim or controversy that may arise between Independent Advisor and Ameriprise Financial or a customer or any other person ("Claims"), unless otherwise agreed to in writing by the Independent Advisor and Ameriprise Financial. To the extent that such Claims are required to be arbitrated under the rules, or by–laws of the NASD, as amended from time to time, they will be arbitrated in accordance with the policies and procedures established by the NASD.[1]

B. If either the NASD declines to administer an arbitration of any Claims or the NASD rules do not allow for arbitration of any Claims, the Independent Advisor and Ameriprise Financial agree that the claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or other applicable rules promulgated by the AAA. In addition, Independent Advisor and Ameriprise Financial specifically agree that all Claims, statutory or otherwise, which allege discrimination or other violation of employment laws, including but not limited to claims of sexual harassment, shall be finally decided by arbitration pursuant to the AAA unless otherwise agreed to in writing by the Independent Advisor and Ameriprise Financial. . . .

E. Except as provided in Section 19, either Independent Advisor or Ameriprise Financial may compel arbitration of any Claims filed in a court of law. In addition, either Independent Advisor or Ameriprise Financial may apply to a court of law for an injunction to enforce the terms of this Agreement pending a final decision on the merits by an arbitration panel pursuant to this provision. . . .

G. Any award by an arbitration panel shall be final and binding upon the Independent Advisor and Ameriprise Financial. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant party or its assets.

---

[1] The NASD (National Association of Securities Dealers, Inc.) is a self-regulatory organization ("SRO") governing the financial industry, which is now known as the Financial Industry Regulatory Authority ("FINRA").

> H. This Agreement is covered and enforceable under the terms of the Federal Arbitration Act.

(Franchise Agreement, Ex. 8 to Walton Aff. § 27.)

A month before signing, Ameriprise sent Plaintiff a copy of the Franchise Agreement and an overview of the Ameriprise Financial Uniform Franchise Circular, summarizing its terms. Plaintiff signed an acknowledgment that he received these documents in advance, (*see* Acknowledgment of Receipt of Franchise Agreement, Ex. 7 to Walton Aff.), and the Franchise Agreement contained an acknowledgment clause, which read:

> Independent Advisor acknowledges that he or she has read and understood this agreement, the attachments hereto, and agreements relating thereto, if any, and that Ameriprise Financial has accorded independent advisor ample time and opportunity to consult with advisors of Independent Advisor's own choosing about the potential benefits and risks of entering into this Agreement.

(Franchise Agreement § 28.)

During his time as an independent Ameriprise Franchisee Plaintiff was registered with FINRA as an Ameriprise–affiliated financial advisor. In order to register, Plaintiff completed a Form U4 Uniform Application for Securities Industry Registration or Transfer ("Form U4"). Beginning in 1990, Plaintiff completed and signed at least eight of these forms. (*See* Exs. 1–6 to Walton Aff.) The Form U4 contains an arbitration clause that reads as follows:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person that is required to be arbitrated under the rules, constitutions, or by–laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(*Id.*)

One of the investment advisory accounts offered by Ameriprise is the Strategic Portfolio Service Advantage ("SPS"). (Am. Compl. ¶ 15.) Ameriprise required that its independent franchisees complete a "written deliverable" for each of the franchisee's customers holding an SPS account. (*Id.* ¶ 24–26). On May 3, 2010, Ameriprise Franchise Vice President Renee Sherman visited Plaintiff's office for an annual compliance meeting. (*Id.* ¶ 27.) At the meeting, Ms. Sherman delivered Plaintiff a Notice of Suspension with Delayed Termination with Cause ("Termination Notice"). (*Id.* ¶ 28; Termination Notice, Ex. A to *id.*) The Termination Notice stated that Ameriprise was terminating Plaintiff's franchise as a result of his repeated failure to complete the annual SPS deliverables for his client. (Notice of Termination at 1–2.) On June 3, 2011, Plaintiff filed suit against Defendant, alleging violations of the CFA and CUTPA, based on the decision to terminate his franchise.

## II.   DISCUSSION

Defendants now move to compel arbitration according to the terms of the Franchise Agreement and the Forms U4 signed by Plaintiff.[2] Plaintiff counters that the arbitration

---

[2] As the Court finds that Plaintiff's claims must be arbitrated under the terms of the Franchise Agreement, the Court need not address Defendant's argument that arbitration is compelled by the FINRA Rules under Plaintiff's Forms U4.

clause of the Franchise Agreement is unenforceable based on economic duress. Plaintiff further contends that if the arbitration clause of the Franchise Agreement could be enforced, his claims are not subject to arbitration under its terms.

### A. Validity of the Arbitration Clause

The Federal Arbitration Act provides that

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Act establishes a "liberal policy in favor of arbitration as a means to reduce the costliness and delays of litigation." *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 665 (2d Cir. 1997) (internal quotation marks omitted) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1063 (2d Cir. 1993).

Plaintiff claims that the arbitration clause in the Franchise Agreement is invalid based on the existence of unequal bargaining power between himself and Defendant and because he was under economic duress when the agreement was signed. "It is clear that questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law,[3] before compelling

---

[3] The Franchise Agreement contains a choice–of–law clause stating that Minnesota law will govern the agreement. (Franchise Agreement § 26.) However, the parties have both cited to Connecticut law in their briefings on the issue of economic duress. Minnesota does not recognize the defense of economic duress, and thus Plaintiff's challenge to the validity of the arbitration clause must fail under that state's law. *See Costigan v. Williams*, No. C7-94-2161, 1995 WL 91571, at *3 (Minn. App. March 7, 1995) ("But even if we assume [the

arbitration pursuant to the FAA." *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360 (2d Cir. 2003).

In order to demonstrate economic duress under Connecticut law, Plaintiff must prove "(1) a wrongful act or threat (2) that left the victim no reasonable alternative, and (3) to which the victim in fact acceded, and that (4) the resulting transaction was unfair to the victim . . . . The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it impossible [for the party] to exercise his own free will." *Ace Equipment Sales, Inc. v. H.O. Penn Machinery Co., Inc.*, 88 Conn. App. 687, 696 (Conn. App. Ct. 2005) (quoting *Traystman, Coric & Keramides v. Daigle*, 84 Conn. App. 843, 846 (Conn. App. Ct. 2004)) (alterations in original). However, to establish economic duress, "it is not sufficient to show that consent was secured by the pressure of financial circumstances, or by the fact that one party insisted upon a legal right and the other party yielded to that insistence, and actionable economic duress will not be found to have been proved unless there was no reasonable alternative to the terms presented by the party whose conduct is claimed to have been coercive." *Twatchman v. Hastings*, No. CV 9557307S, 1997 WL 433878, at *9 (Conn. Super. Ct. July 23, 1997), *aff'd by* 52 Conn. App. 661 (Conn. App. Ct. 1999) ("The mere fact that a person enters into an agreement as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, cannot be the sole basis for a claim of business compulsion or economic duress,

---

plaintiff] was under economic duress, Minnesota does not recognize this as a defense to contract.") (citing *St. Louis Park Inv. v. R.L. Johnson Inv.*, 411 N.W. 2d 288, 291 (Minn. App. 1987)). As the Court finds that Plaintiff could not prevail under Connecticut law either, the Court will address the economic duress defense under that standard, as it was briefed by the parties.

6

nor can such a claim be predicated on a demand which is lawful or upon the assertion of a legal right, in the absence of a wrongful act by the party against whom the claim is made that takes undue or unfair advantage of the situation to coerce him into making the agreement.")

Plaintiff claims that he was told that "the terms and conditions of the Franchise Agreement were not subject to discussion, negotiation, or even explanation, and were being offered [] on a 'take it, or leave it' basis," and that if he did not sign the Franchise Agreement his clients would be transferred and he would be assigned to another Ameriprise office. (Ironson Aff., Ex. A to Pl.'s Opp'n [Doc. # 21] ¶¶ 10–11.)  As a result, Plaintiff claims he "genuinely believed that if [he] did not immediately sign the Franchise Agreement . . . [he] would be summarily stripped of everything that [he] had worked for and built up over the course of the preceding fifteen years, and upon which [he] depended entirely for income to support [his] family." *Id.* ¶ 12.  However, under Connecticut law, economic necessity cannot be the sole basis for a claim of economic duress. *See Twatchman*, 1997 WL 433878, at *9. Furthermore, courts in this district have found, when interpreting Connecticut law, that the mere fact that continued employment was conditioned on acceptance of an arbitration agreement is insufficient to establish economic duress. *See Morales v. Rent–A–Center, Inc.*, 306 F. Supp. 2d 175, 181–82 (D. Conn. 2003); *see also Lawler v. Blazawski*, No. CV 940056909S, 1998 WL 70590, at * 10–11 (Conn. Super. Ct. Feb. 11, 1998) (finding that in the absence of threats of actual bodily harm, duress will not be found where the contracting party is free to consult with counsel).

Plaintiff is an educated businessperson capable of understanding a contract. (*See* Ex. 14 to Walton Aff. (detailing Plaintiff's educational background).)  He received the Franchise Agreement a month in advance, giving him ample time to review its terms and consult with

an attorney. Unlike those cases in which an arbitration agreement was upheld even where continued employment was conditioned on assent, here Plaintiff would have been given the opportunity to continue working as an Ameriprise employee if he had rejected the Franchise Agreement. Based on these facts, Plaintiff has failed to establish under Connecticut law that he was under economic duress when he signed the Franchise Agreement, and thus the arbitration clause is valid.

      B. Scope of the Arbitration Clause

Plaintiff next argues that his claims are not covered by the arbitration clause in the Franchise Agreement, and are in fact expressly excluded from arbitration under the terms of the agreement. The Second Circuit articulated a three–part analysis in *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001) for addressing challenges to whether the scope of the parties' agreement covered the claims being asserted. First, "a court should classify the particular [arbitration] clause as either broad or narrow." *Id.* at 224. Second, if the court determines the clause to be narrow, it "must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause," but the issue will generally be deemed outside the purview of a narrow clause. *Id.* (internal citations and quotation marks omitted). Third, if the clause is determined to be broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (internal citations and quotation marks omitted).

### *1.     The Arbitration Clause in the Franchise Agreement Is Broad*

When deciding whether an arbitration clause is broad or narrow, a court must "determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Id.* at 225. Courts in this Circuit have determined that arbitration clauses containing general language similar to the language at issue here were broad, rather than narrow, in scope. *See, e.g.*, *Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16 (2d Cir. 1995) (labeling as "broad" a clause that "any claim or controversy arising out of or relating to this agreement shall be settled by arbitration"); *Shah v. Santander Consumer USA, Inc.*, No. 3:11cv00096, 2011 WL 5570791 (D. Conn. Nov. 16, 2011) (finding as "broad" a clause stating that: "You and we can choose to have any particular claim or dispute arising from this Contract of whatever nature between you and us resolved by neutral binding arbitration); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140 (D. Conn. 2005) (describing the following clause as a "paradigmatic, broadly worded arbitration clause": "Any controversy or claim arising out of or relating to th[ese agreements] will be settled by binding arbitration"). Under the arbitration clause in the Franchise Agreement, the parties "agree to arbitrate any dispute, claim or controversy that may arise between Independent Advisor and Ameriprise Financial." (Franchise Agreement § 27.A.) This language is sufficiently similar to the clauses in the cases cited above for the Court to determine that the arbitration clause at issue in this case is broad.

### 2.. *Plaintiff's Statutory Claims Are Covered by the Arbitration Clause*

Once a court determines that an arbitration clause is broad, there is a presumption of arbitrability such that arbitration may be compelled for all collateral matters implicating the rights and obligations of the parties under the agreement. *See Louis Dreyfus Negoce, S.A.*, 252 F.3d at 224. However, Plaintiff argues that because his claims do not implicate FINRA rules, and because they are expressly exempted from arbitration, they are not covered by the arbitration clause of the Franchise Agreement.

Plaintiff first contends that because his claims as a franchisee fall outside the scope of FINRA's rules, he cannot be compelled to arbitrate them. Even assuming that Plaintiff's characterization of FINRA's rules is correct, his argument still fails. The language of the arbitration clause clearly contemplates the arbitration of claims under the Franchise Agreement that do not implicate FINRA's Rules:

> If either [FINRA] declines to administer an arbitration of any Claims *or the [FINRA] rules do not allow for arbitration of any Claims*, the Independent Advisor and Ameriprise Financial agree that the claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or other applicable rules promulgated by the AAA.

(Franchise Agreement § 27.B (emphasis added).) Thus, the mere fact that Plaintiff's claims may not be covered by FINRA's rules does not mean that they cannot be arbitrated under the terms of the Franchise Agreement.

Plaintiff also asserts that his claims have been expressly exempted from arbitration by the terms of the Franchise Agreement. To support this contention, Plaintiff cites to the following language in the UFOC Defendant provided to Plaintiff in conjunction with the

10

Franchise Agreement: "These states have statutes which may supersede the Franchise Agreement in your relationship with us including the areas of termination and renewal of your franchise: . . . Connecticut." (Pl.'s Opp'n at 24.) However, this clause does not expressly mention arbitration, and only indicates that the Franchise Agreement *may* be superseded. "In the absence of any express provision excluding a particular [claim] from arbitration, . . . the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where . . . the exclusion clause is vague and the arbitration clause is quite broad." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584–85 (1960). The vague language of the UFOC, which is not itself a part of the Franchise Agreement, does not rise to "forceful evidence" that the parties intended to exempt claims regarding the termination of the franchise from arbitration, and thus does not overcome the presumption of the arbitrability of their claims.

Finally, Plaintiff claims that the CFA secures the right to access state courts to address any violations of that law, and therefore any waiver of this right under the Franchise Agreement is void. However, several courts in this district have rejected this argument, finding that CFA and CUTPA claims are properly arbitrable. *See Sherman Street Associates, LLC v. JTH Tax, Inc.*, No. 3:03-cv-1875, 2010 WL 1240748, at *2 (D. Conn. Mar. 22, 2010) (collecting cases); *see also Shah*, 2011 WL 5570791, at *5 (concluding that plaintiff's CUTPA claims were collateral matters implicating rights created by the agreement at issue and were thus properly arbitrable); *Stodolink v. Yankee Barn Homes, Inc.*, 574 F. Supp. 557, 558 (D. Conn. 1983) ("Plaintiff posits a conflict between the public policy of the state and that of the Congress, and would have this court declare the arbitration agreement null and void for violating the Connecticut Franchise Act's anti–waiver provision. The court declines this

11

invitation. . . .   Accordingly, the short answer to plaintiff's contentions under the Connecticut Franchise Act is that the state law is not controlling in the face of congressional exercise of authority over interstate commerce."). Under the third prong of the *Louis Dreyfus Negoce S.A.* analysis, Plaintiff's CFA and CUTPA claims that Defendant improperly terminated his franchise implicate the rights and obligations of the parties under the Franchise Agreement and are presumed to be arbitrable.

III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Stay and to Compel Arbitration [Doc. # 19] is GRANTED. The case will now be administratively closed pending the final outcome of the arbitration. Either party has the right to have this case restored to the active docket by filing a motion to restore within 21 days of issuance of the arbitrator's final decision.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of September, 2012.